FILED
APR 30 2018
*[signature]* Matthew ~~~~
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| IN THE MATTER OF THE SEARCH OF: Samsung cell phone seized from Dana Faulkner, more fully described in Attachment A, attached hereto and incorporated by reference. | 5:18-mj-60 AFFIDAVIT IN SUPPORT OF SEARCH WARRANT |

STATE OF SOUTH DAKOTA    )
                         )
COUNTY OF PENNINGTON     )

I, Casey Kenrick, Investigator for the Pennington County Sheriff's Office (PCSO), being duly sworn, state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1.      I am an Investigator with the PCSO, in Rapid City, South Dakota. I began my law enforcement career in 1999 with the United States Air Force as Security Forces. At various times I was assigned as a patrolman and responded to in-progress crimes. In 2005 I began my career with the Pennington County Sheriff's Office as a Juvenile Corrections Officer at the Western South Dakota Juvenile Services Center. In August of 2006 I was selected to become a Deputy Sheriff with the Office. I was initially assigned to the Patrol Division as a Patrolman. I spent nearly six years in the Patrol Division; at different times I was assigned to traffic, and spent over three years as a Field Training Officer. In July 2012, I was selected to become an Investigator. I am also a member of the Rapid City/Pennington County Special Response Team.

2.      I am currently assigned to the Unified Narcotics Enforcement Team (UNET). My primary role is to investigate illegal drug crimes. During my career, I have been involved in the investigation of crimes including murder, rape, property offenses and drug related offenses. During my career, I have received over 1000 hours of informal and formal training. My training is primarily from the South Dakota Law Enforcement Academy, Pennington County Sheriff's Office, Rapid City Police Department and the United States Air Force.

3.      I submit this affidavit in support of an application for a warrant pursuant to Federal Rule of Criminal Procedure 41, authorizing a search of the locations and objects described in Attachment A, and believed to hold evidence of violations of 21 U.S.C. §§ 841(a) and 846, Conspiracy to Distribute a Controlled Substance, and 18 U.S.C. § 922(g)(1), Prohibited Person in Possession of Firearm. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other law enforcement, from my discussions with witnesses, and from my

1

review of records and reports relating to the investigation. Because this affidavit is being submitted for the limited purpose of securing an order authorizing the search of the device described in Attachment A for the information listed in Attachment B, I have not included details of every aspect of the investigation.

## FACTS IN SUPPORT OF PROBABLE CAUSE

4. On 6/28/17, Source of Information (SOI) #1 informed law enforcement that his/her drug supplier goes by "Kidd". SOI#1 described "Kidd's" boss as being named "Diablo". "Diablo" showed up at SOI#1's residence with a gun and said that "Diablo" was holding SOI#1 responsible for a $25,000 drug debt. SOI#1 denied owing "Diablo" $25,000 and believed it was from either a drug deal gone bad or a seizure of drugs by law enforcement.

5. SOI#1 explained a few days before the interview he/she was at SOI#2's residence. SOI#2 requested SOI#1's help to pick up a car in Meade County. SOI#1 agreed to help. Once SOI#2 and SOI#1 arrived, SOI#2 stopped on a dirt road where there was another car. SOI#1 saw "Diablo" in the car, was fearful of "Diablo", exited SOI#2's car, and fled to avoid "Diablo." SOI#1 turned himself in to law enforcement in order to elude "Diablo."

6. SOI#1 went on to tell law enforcement that before going to Meade County with SOI#2, SOI#1 had met with "Diablo" at Watiki Water Park in Rapid City. SOI#1 received one pound of methamphetamine from "Diablo" at that time, which he/she later sold. SOI#1 understood this arrangement was payment for the debt "Diablo" was holding SOI#1 accountable for.

7. SOI#1 also informed law enforcement that SOI#4 sold multiple pounds of methamphetamine and heroin for "Diablo". Additionally, SOI#1 informed law enforcement that SOI#3 dealt multiple pounds of methamphetamine for "Diablo". "Diablo's" practice is to bring heroin, methamphetamine, and cocaine in the tires of whichever vehicle he transports the controlled substances in from Colorado to South Dakota. Once "Diablo" arrives in Rapid City, he goes to SOI#3's house and unloads the controlled substances, which are further distributed from SOI#3's house to others.

8. On 7/10/17, SOI#5 overdosed on heroin. Drug paraphernalia was observed inside the residence by law enforcement upon responding to the scene. SOI#5 later admitted to law enforcement officers that SOI#2 gave him/her the heroin he/she used to overdose. No search warrant was conducted at that time.

9. On or about 8/2/17, SOI#2 informed law enforcement that for the last few weeks he/she had been hanging out with SOI#1 at SOI#1's residence. SOI#4 contacted SOI#2 and asked SOI#2 to come to a hotel to meet SOI#4. SOI#2 agreed. Once SOI#2 was in the room, "Diablo" came out of the back of the room. "Diablo" threatened SOI#2 with a firearm and accused SOI#2 of hiding SOI#1 from him. SOI#2 denied to "Diablo" that he/she was hiding SOI#1 but "Diablo" then said SOI#2 was now on the hook for the $25,000 SOI#1 owes "Diablo." "Diablo" threated to kill SOI#2's family if SOI#2 did not cooperate. A few days later, SOI#2 dropped SOI#1 off where "Diablo" requested (in Meade County). This was confirmed by what SOI#1 told law enforcement (as described in paragraph 3).

10. SOI#2 said "Diablo" forced SOI#2 to sell heroin, methamphetamine and cocaine for "Diablo" by threatening to kill his/her family if he/she did not cooperate. SOI#2 also said he/she has seen "Diablo" with a DEA badge and numerous firearms. SOI#2 said he/she was getting a half-ounce of methamphetamine from "Diablo" every week. He/She estimated receiving from "Diablo" in the previous five-six weeks: a total of a half-pound of methamphetamine, a half-pound of heroin and a half ounce of cocaine. SOI#2 stated he/she is in debt to "Diablo" for $25,000, and had $2,000 in cash in the hotel room to pay "Diablo".

11. On 8/2/17, SOI#3's vehicle was stopped by law enforcement. During a search of the vehicle, law enforcement located approximately $16,000 cash, suspected methamphetamine, heroin, cocaine, a firearm, and a stolen Pennington County Deputy badge. SOI#3 told law enforcement the money in the vehicle belonged to "Diablo" and alluded to it being drug money. SOI#3 denied knowing "Diablo's" true identity. SOI#3 indicated he/she was carrying a firearm because he/she was fearful of "Diablo" and his threats of violence. When asked who was going to be responsible for the money being seized by law enforcement from the vehicle, SOI#3 started

to cry and said "Diablo" would hold SOI#3 responsible for it. SOI#3 appeared to law enforcement to be genuinely scared of "Diablo".

12.     On 8/7/17, SOI#2 informed law enforcement that "Diablo" told him/her that "Diablo" was going to take three people out of the equation during the upcoming week. SOI#2 did not know who the three people were and "Diablo" did not tell SOI#2 the identities. SOI#2 believes that "Diablo" meant he was going to kill people.

13.     On 8/10/17, SOI#3 was interviewed by law enforcement. SOI#3 explained he/she was in debt to "Diablo" for $150,000 for illegal drugs he/she has received from "Diablo". SOI#3 advised he/she had received multiple pounds of methamphetamine from "Diablo" in prices ranging from $12,000 to $11,000 per pound. SOI#3 advised that he/she had received three pounds of methamphetamine at a time from "Diablo" on multiple occasions and on one occasion received ten (10) pounds.

14.     On 8/21/17, law enforcement interviewed SOI#6. SOI#6 stated he/she met "Diablo" through SOI#1 in May 2017. SOI#6 knew SOI#1 to be receiving controlled substances from "Diablo" a few years prior. SOI#6 recalled receiving seven ounces of methamphetamine, one ounce of heroin, and 3.5 grams of cocaine from "Diablo". SOI#6 advised that during the first week "Diablo" was in town, he/she helped move thirty (30) pounds of methamphetamine for "Diablo" with SOI#3, SOI#1, and SOI#4. SOI#6 advised that "Diablo" would bring 10 - 20 pounds of methamphetamine to the Rapid City area one to three times per week. SOI#6 related he/she helped him set up methamphetamine distribution in Rapid City before his arrivals from Colorado, rather than selling the drugs for him. SOI#6 stated "Diablo" always carries a handgun and was trying to obtain a suppressor because he wanted to use it to kill SOI#2 and SOI#1.

15.     On 8/28/17, law enforcement received information that "Diablo" wanted to meet with the SOI#2 to collect $5,000 of an owed drug debt. Law enforcement advised SOI#2 not to meet with "Diablo" as information was received that "Diablo" wished to kill him/her. A Confidential Informant (CI) provided the

location of where "Diablo" wanted to meet and law enforcement set up surveillance at that location. The CI also provided a description of the vehicle "Diablo" was driving as a white BMW. Law enforcement observed a vehicle matching the description, and the operator of the vehicle also matched the physical description of "Diablo". Rapid City Police Department performed a traffic stop on the vehicle and the driver was taken into custody. The driver was identified as Dana Faulkner. A search of Faulkner revealed a handgun (Taurus, model PT 24/7 PRO C DS, .40 caliber pistol bearing serial number SD097005) concealed on his person. An NCIC check of the firearm revealed it had been reported stolen in Rapid City. An inventory of the vehicle was conducted prior to towing. During the inventory, a vape pen with a substance consistent with methamphetamine oil was located in the driver-side door. Officers also located a backpack in the back seat that contained 2-4 grams of a substance that is consistent with methamphetamine and an extensive owe sheet related to drug distribution.

16. A review of Dana Faulkner's criminal history record reveals a prior felony conviction for Burglary and Robbery with a firearm or deadly weapon.

17. On November 22, 2017, a federal Grand Jury in Rapid City, SD, returned an indictment (CR 17-50144) against Dana Faulkner, a/k/a "Diablo", for charges of Conspiracy to Distribute a Controlled Substance (methamphetamine, heroin, and cocaine), all in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(A) and (C), Use of Firearm in Furtherance of Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and Prohibited Person in Possession of Firearm in violation of 18 U.S.C. § 922(g)(1). Dana Faulkner is currently in federal custody pending resolution of these charges.

18. A search of this phone was previously authorized on September 14, 2017 in case number 5:17-mj-150. Efforts were made to search the phone but law enforcement was unable to unlock the phone and access the contents as authorized by that search warrant. In March 2018, new technology was released which can bypass the passcodes on nearly all iOS devices. The South Dakota Division of Criminal Investigation purchased this technology and now has the ability to bypass the passcodes on devices that were previously not accessible. The device will be provided to law enforcement agents in Rapid City authorized to use the new technology for

extraction of the passcode and a subsequent extraction of the data from the phone, once the passcode is removed from the device. I believe this new technology will work on the device described in Attachment A.

*Modus Operandi of Drug & Firearm Traffickers*

19. During my tenure in law enforcement, I have been involved in numerous investigations of narcotic trafficking organizations involving the distribution of controlled substances and the amassing and concealing of the proceeds of these sales. I have interviewed drug users and dealers regarding the manner in which they operate and have become familiar with their techniques. I have executed search warrants for vehicles, residence, hotel rooms, as well as search warrants for devices, records, ledgers, and documentation reflecting the sale of controlled substances.

20. Based upon my training and experience, including my direct experience in this investigation, I have developed knowledge regarding practices commonly used by drug traffickers and their organizations, including:

A. That drug traffickers often maintain, on hand, large amounts of cash (typically U.S. currency) in order to finance their drug distribution activities;

B. That it is common for drug traffickers to secrete contraband (including controlled substances), proceeds of drug sales, and records of drug transactions in secure locations within their residences, business, in lock boxes/safes and vehicles to conceal them from law enforcement.

C. That drug traffickers commonly maintain addresses or telephone numbers in books, documents and electronic devices that have memory which include computer hard drives, cellular phones, Global Positioning Systems which reflect names, addresses and telephone numbers of the associates in the trafficking organization.

D. I also know that individuals involved in the distribution of controlled substances and their associates correspond and communicate using internet, social media, email, cellular phone text messages and that their computers and/or other electronic storage media in their possession may be used to prepare, create, and maintain writings, records, and documents relating to their activities and associations, including but not limited to the trafficking of controlled substances.

E. Through my own experience and training, I am aware that it is common for narcotics traffickers to utilize cellular telephones to facilitate their drug trafficking activities. I am also aware that in addition to using the telephones for communication purposes, said traffickers may also use the internal memory (such as "phone book" or "notes" functions) of the telephone to store names, identifying information,

and contact telephone numbers of individuals involved in said drug-trafficking enterprises, and that certain models of cellular telephone also maintain limited logs of past calls made by that telephone.

F. I am also aware that more people, including drug traffickers, are utilizing "Smart" phones, such as Apple iPhones, and GPS units for travel directions. These GPS units can be standalone devices manufactured for that single purpose or applications used through cellular phones. Many of the "Smart" phones and GPS units are programmed with addresses from around the United States and all a user has to do is enter the address he/she wants to travel to and the "Smart" phones and GPS units will provide a travel route for the user. Besides providing a travel route for the user most of the "Smart" phones" and GPS units also automatically keep track of the route the user has taken and will back track the route to the point of origin.

G. That drug traffickers take or cause to be taken photographs and videos of themselves, their associates, their assets, their travels, and their product. That these traffickers usually maintain these photographs and videos in their possession, or within their residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

H. That it is generally a common practice for drug traffickers to maintain in their residences and/or other locations over which they maintain dominion and control records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records (drug ledgers) to show balances due for drugs sold in the past ("pay"), and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers, and keep them immediately available in order to efficiently conduct their drug trafficking business. Such records can be maintained on paper, cellular phones, or other devices.

I. That it is a generally common practice for drug traffickers to make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with services to facilitate their illegal activities. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in a trafficker's residence and/or other locations over which they maintain dominion and control, including cellular phones.

J. I am also aware that a Subscriber Identity Module ("SIM") card is a portable memory chip predominantly used in cellular phones that hold information regarding the cell phone's number, address, book, text messages, and other data. SIM cards can typically be removed from a phone and placed in another phone, retaining its original data. SIM cards usually have a unique number associated with it so that it can be associated with a particular cell phone service provider.

K. Drug dealers keep paraphernalia for packaging, weighing, using and distributing controlled substances and the paraphernalia include, but are not limited to, scales, plastic bags, aluminum foil, paper bindles, zip lock bags and other containers commonly used to package and store controlled substances.

L. Illegal drug traffickers commonly have people at their residence or arriving at their residence purchasing illegal substances. The nature of the criminal activity is such that participants frequently shift or change, making it challenging for law enforcement to predict that any specific person or persons would be on the premises at any given time.

M. Illegal drug traffickers commonly use surveillance equipment at their residence and places they store illegal drugs. The surveillance equipment is used to protect the illegal drugs and often times record people coming and going from their residence for illegal drug transactions. Surveillance equipment may include, but not limited to: cameras, monitors, televisions, DVD players, computers, hard drives, and applicable power and mechanical cords.

N. Drug distributors frequently trade illegal drugs for stolen property and firearms.

O. Drug distributors frequently possess firearms in the furtherance of their drug activities, such as intimidation, protection or threats.

P. Drug dealers frequently attempt to hide their contraband, money, and other items related to distribution in secure and secret locations, to include but not limited to, other residences or storage units.

Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

21. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the DEVICES was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

24. *Request to seal.* I request an order sealing this case until further order of the Court, in that this search is being conducted as part of an ongoing federal criminal investigation and contains information from persons cooperating with law enforcement. Disclosure of information contained in the documents incorporated in this search and filed with the Court could seriously jeopardize this ongoing investigation.

## CONCLUSION

25. I submit that based on the facts set forth in this affidavit, there is probable cause to believe the locations described in Attachment A contains evidence, fruits, and or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 922(g)(1). Therefore, I request permission to search the device in Attachment A for the evidence, fruits, and instrumentalities identified with particularity in Attachment B.

Based on the foregoing, I request that the Court issue the proposed search warrant.

Casey Kenrick, Investigator
Pennington County Sheriff's Office & Task Force
Officer for Unified Narcotics Enforcement Team

Sworn to before me and: ☒ signed in my presence.
☐ submitted, attested to, and acknowledged by reliable electronic means.

this 30th day of April, 2018

Daneta Wollmann
United States Magistrate Judge

10